DUDLEY O. WATSON, ADMINISTRATOR, ETC., v. THE GRAND RAPIDS & INDIANA RAILROAD COMPANY AND THE MUSKEGON, GRAND RAPIDS & INDIANA RAILROAD COMPANY ET AL.

*Mortgage—Foreclosure—Purchase by administrator—Rights of second mortgagee.*

A second mortgagee, whose mortgage was not due, arranged with the first mortgagee to foreclose his mortgage, and agreed to pay a portion of the expenses of the foreclosure. The mortgagor had conveyed a right of way for a railroad over the mortgaged premises after the execution of the mortgages, which were duly recorded. Pending the foreclosure, the second mortgagee died, and the suit was revived against his administrator, who attended the foreclosure sale. The land was offered for sale in two parcels, in the inverse order of alienation, and the administrator bid in the whole premises, except the parcel sold to the railroad company, for the full amount due on the decree. Before the sale the solicitor for the administrator announced in the presence of the solicitor for the railroad company, who was present looking after its interests, that the administrator held a second mortgage upon both parcels. On the maturity of the second mortgage the administrator filed a bill to foreclose.

it on the railroad right of way parcel. And in affirming a decree for the sale of this parcel to satisfy the second mortgage, the Court hold:

*a*—In the absence of any agreement, the administrator was under no obligation to take care of or look after the interests of the railroad company, which was represented by its solicitor, who was apprised of the situation, and could have bid upon the first parcel up to the amount of both mortgages, if the land was worth that sum, as now claimed, and thereby freed the parcel owned by the railroad company from the lien of both mortgages; and there was no legal or equitable obligation resting upon the administrator to bid upon both parcels, when he could protect himself by bidding upon one, it not appearing that he was conducting the sale, or that he had anything to do with the order of sale, or that he prevented the solicitor for the railroad company from bidding upon the first parcel.

*b*—An administrator who bids in land at a foreclosure sale to protect the lien of a second mortgage held by the estate acquires the same title against third parties as any other purchaser, and the fact that the land may be or is treated as personal estate in the distribution of the estate does not affect his holding. He acquires the fee, and can dispose of it by deed, which will convey the same title as that of any other purchaser.

*c*—As long as the holder of a second mortgage sees land enough left from the sale under the first mortgage, he can, if he chooses, refrain from bidding on such sale, and rely for his security upon the unsold land, or he may bid in enough of the land to discharge the first mortgage, and enforce his security upon the remainder, if he is guilty of no deception or fraud in such purchase, especially when the owner of the remainder of the land is upon the ground, and is fully apprised of the situation, and in a condition to protect himself by also bidding upon the parcel or parcels sold.

Appeal from Ottawa. (Arnold, J.) Argued February 5, 1892. Decided April 8, 1892.

Bill to foreclose a mortgage. Defendant railroad companies appeal. Affirmed. The facts are stated in the opinion.

*George A. Farr,* for the complainant, contended:

1. The railroad company took its title and possession subject to

the lien of the mortgage held by complainant's intestate, and could only require that the sale should be made in the inverse order of alienation; citing 1 Jones, Mort. § 736.

2. The only method by which the damage to the mortgagees for the building of appellants' railroad over the mortgaged land could be ascertained was by proceedings under How. Stat. chap. 91, and this remedy was exclusive; citing *Derby v. Gage,* 60 Mich. 1; and the mortgagees were necessary parties; citing *Railway Co. v. Barnes,* 40 Mich. 383; and, failing in this proceeding, the appellants have no greater rights than any purchaser of the equity of redemption, except the right of condemnation under the statute, which right still exists; citing *Morgan's Appeal,* 39 Mich. 675.

3. Counsel contended for the doctrine of the opinion as to the points decided.

*T. J. O'Brien* and *J. H. Campbell,* for appellants, contended:

1. Parcels of land charged with a mortgage debt must be sold to satisfy the mortgage in the inverse order of alienation; citing *Mason v. Payne,* Walk. Ch. 459; *Cooper v. Bigly,* 13 Mich. 463; and this rule does not depend upon the existence or non-existence of covenants of warranty; citing *Threshing Machine Co. v. Mitchell,* 74 Mich. 683.

2. The courts will not allow parts of mortgaged premises conveyed or incumbered subsequent to the mortgage to be, by any course of dealing, charged with more than their fair and equitable proportion of mortgage debts; citing *Gilbert v. Haire,* 43 Mich. 283.

3. The complainant stands in the relation of assignee of the Austin mortgage, and not purchaser of the land; citing How. Stat. §§ 5880–5883; *Kelly v. Kelly,* 54 Mich. 30; *Johnson v. Johnson,* Walk. Ch. 331; *Mattison v. Marks,* 31 Mich. 421; *Manwaring v. Powell,* 40 Id. 371; 1 Jones, Mort. § 878; 2 Id. § 1086.

4. If the complainant under his foreclosure deed, which runs to him as administrator, must be held to be a purchaser of the land, such purchase operates as a merger and extinguishment of his mortgage lien *pro rata;* citing 1 Washb. Real Prop. 185, subd. 20; 1 Jones, Mort. § 848; *Winans v. Wilkie,* 41 Mich. 264; *Bank v. Webb,* 56 Id. 377; *Clark v. Clark,* 76 Wis. 306.

MORSE, C. J. The evidence in this case shows that David W. Boyes, in 1886, was the owner of a farm of

about 141 acres in the county of Ottawa. In February of that year he gave a mortgage upon the same for $1,600 to William G. Watson, of Coopersville. This mortgage secured four notes, one for $600, due May 1, 1886, and three for $333.33 each, due, respectively, December 1, 1887, December 1, 1888, and December 31, 1889. There was at this time a mortgage on the same premises held by Calvin P. Austin, upon which there was due over $4,000. This mortgage was in the hands of Henry Fralick, of Grand Rapids. It was not due, but contained a clause making the whole sum due at the option of the mortgagee in case of default in the payment of interest for more than 60 days. There was no such provision in the Watson mortgage. In November, 1887, a correspondence was begun between Fralick and William G. Watson, continuing into December, 1887, which resulted in an offer on the part of Fralick to foreclose the Austin mortgage, if Watson would pay him $30 over and above the taxable solicitor's fee, which offer was accepted by Watson. The foreclosure was in chancery, William G. Watson and the defendant railroad companies being made, with others, parties defendant.

In July, 1886, the Muskegon, Grand Rapids & Indiana Railroad Company acquired from Boyes a strip of land 100 feet wide across this farm for railroad purposes, and in the month of August, 1886, went into possession of said strip, and has ever since operated and run a railroad upon it, it being part of its line from Grand Rapids to Muskegon.

The sale under the Austin foreclosure took place March 13, 1889. The commissioner offered the premises for sale in two parcels, first putting up the whole farm excepting this 100-foot strip occupied by the railroad company. This was in the inverse order of alienation. Dudley O. Watson, as administrator of William G. Wat-

son, who died in 1888, bid in the farm for the whole sum due on the mortgage, and the railroad strip was not sold. There were present at this sale, as shown by the commissioner's report, John S. Lawrence, solicitor for Austin; George A. Farr, solicitor for Watson; and T. J. O'Brien, solicitor for the railroad company. Dudley O. Watson testified that he was also present. The commissioner reports that the premises were divided into two parcels and so offered for sale at the request of Mr. Lawrence; and that before the sale Mr. Farr announced that Dudley O. Watson, as administrator of William G. Watson, deceased, held a second mortgage on the whole premises, not excepting the right of way of the railroad company. The sum bid for the first parcel, the farm without the railroad strip, was $4,952.68. This was sufficient to meet the whole amount due and expenses, and the commissioner returned that it was not necessary to sell the railroad strip. Afterwards the complainant filed this bill to foreclose the Watson mortgage upon this railroad strip, and had his decree in the court below, August 3, 1891, for $2,187.20, with an order for the sale of said strip, if such sum was not paid on or before August 20, 1891. None of the defendants, except the railroad companies, defended in the court below, and the case comes to this Court upon the appeal of such companies.

The defense set forth in the answer was that William G. Watson actually bought the Austin mortgage, but, instead of taking an assignment in the usual way, requested that it be formally foreclosed in the name of Austin; that William G. Watson at the time the Austin foreclosure was commenced, and Dudley O. Watson at the time of the sale under such foreclosure, knew of the rights of the railroad companies in the premises, and that equity demanded that said Dudley O. Watson should

bid upon the parcel, to wit, the farm less the railroad strip, only its proportionate share of the indebtedness, leaving the railroad parcel to be offered for its proportionate share of the debt; that the value of the first parcel exceeds the total amount of the debt upon the Watson mortgage and the sum bid by the complainant at the Austin foreclosure sale; that in equity this railroad parcel is only chargeable with such proportion of the amount due upon the Watson mortgage as the value of the railroad parcel, without the improvements made thereon by the railroad company, bears to the value of all the land with the other improvements. The answer asks for a decree to this effect and for relief as in a cross-bill.

The proofs fail to show that William G. Watson ever purchased the Austin mortgage, or ever negotiated for its purchase. Watson, before the time he had his correspondence with Fralick, had contemplated foreclosing his mortgage, but found he could only foreclose for what was due. He first wrote to Fralick, asking him how long he would let the Austin mortgage run, as he thought the tenant upon the place might buy the farm. What reply Fralick made does not appear. Watson afterwards wrote Fralick, saying: "I do not know any other way than to foreclose at once;" but it is not clear which mortgage he meant,—his own or the one in Fralick's hands. Fralick writes him to foreclose his (Watson's) mortgage at once. Watson replies that he cannot do so, because his mortgage is not all due. Fralick then makes the offer heretofore stated, and Watson finally agrees to pay the $30 if Fralick will foreclose. All that appears from this correspondence and Fralick's testimony is that Boyes was paying no interest on the Austin mortgage, and Watson, who held the second mortgage, which he could not foreclose for the full amount, wanted Fralick to

foreclose the first mortgage, and was willing to pay part of the expenses if he would do so.

When the sale took place under this foreclosure, in the absence of any agreement, the administrator of Watson was under no obligation to take care of or look after the interests of the railroad companies. These companies were present by their solicitor, and knew the situation. They acquired their rights in this strip of land with notice of these mortgages, which were of record. They took this strip subject to these mortgages. The premises were offered for sale in two parcels, and, in accordance with the law and practice in such cases, the farm without the railroad strip was first put up. Before this was done, Watson's attorney gave notice of the Watson mortgage, and that it covered both parcels. It was the duty of Mr. O'Brien, solicitor for the railroad companies, to take such steps as were open to him to protect his clients' interests. He could have bid upon this first parcel up to the amount of the two mortgages, if the land was worth it, as now claimed, and thereby freed the railroad strip from both mortgages. There was no legal or equitable obligation resting upon Watson to bid upon both parcels, when he could protect himself by bidding upon one. It does not appear that he was conducting the sale, that he had anything to do with the order of sale, or that he prevented Mr. O'Brien from bidding upon the first parcel.

It is claimed, however, in defendants' brief, that the administrator made an agreement with Mr. O'Brien that the land should be offered in two parcels, as it was, and that the proportionate share of the railroad parcel was $118; that Watson should bid in the farm at the amount of the Austin mortgage debt, less $118, and that O'Brien should bid in the railroad strip at $118, thus freeing

that parcel from the Watson mortgage, and giving the railroad companies a perfect title to it. This alleged agreement was not set out in the answer, nor is there any evidence in the record tending to show any such agreement. The statement is made by Mr. Farr, complainant's solicitor, in opening his case in the court below, which opening is printed in the record, that at the sale under the Austin foreclosure—

"The complainant was present by his solicitor, Mr. Lawrence. * * * There was an understanding between Mr. O'Brien and complainant that the parcels should be put up separately, and the amount that complainant would bid upon the whole farm, and then upon the right of way; bid the amount that was due upon the whole farm, the complainant bid the whole amount except the $118."

In using the word "complainant" Mr. Farr evidently referred to Austin, and not to Dudley O. Watson. Mr. Farr further stated in the court below that the complainant, meaning Austin, bid the whole amount due, less $118, upon the first parcel, and then $118 was bid upon the railroad strip; that the administrator, meaning Watson, then bid the whole amount due upon the first parcel, and the strip was not sold. Dudley O. Watson swears that he never directed anybody as to the manner in which these parcels should be sold, nor did any one for him, to his knowledge. Mr. O'Brien is not sworn, and there is not a particle of proof from any source that Watson made any arrangements with O'Brien or any one else as to this sale.

It is contended by defendants' counsel that the complainant in this case stands in the relation of assignee of the Austin mortgage, and not as purchaser of the lands. One of the reasons for this contention has been heretofore disposed of, to wit, that William G. Watson was in equity an assignee because of his dealings with

Fralick. Another reason urged is that Dudley O. Wat-son, as administrator, in such a case as this could acquire no other right than assignee in effect; that, while he is authorized to bid in real estate sold on a mortgage held by him to protect the estate, he is not authorized to do so in any other case; and if it be held that he could bid in the land, as in this case, to protect the lien of a second mortgage held by him on the premises, the right which he would acquire by such bid would not be that of a purchaser of the fee, but, by operation of the doctrine of subrogation, the right to have the first mortgage lien continued for his benefit, and to be reimbursed for whatever he had paid on that account, and for that purpose to foreclose the prior mortgage along with his own. We see no good reason why an administrator, bidding at a foreclosure sale to protect the lien of a second mortgage, held by him as such administrator, should acquire any other or different title than an individual bidding under the same circumstances; nor is there any doubt of his right so to bid to protect such mortgage. Nor is there any equitable consideration that puts a person bidding upon premises at such a sale, because he holds a second mortgage upon the premises, in any different position than a person bidding who has no second mortgage or other lien upon the premises. And an administrator, bidding to protect his lien, acquires the same title against third parties as does any other purchaser. The fact that property so acquired may be or is treated as personal estate in the distribution of the property of his intestate does not affect his holding of the lands as to others. He acquires the fee, and can dispose of it by deed, which deed will carry the same title as would the deed of any other purchaser.

There is no legal or equitable obligation resting upon

the complainant in this case to forego the foreclosure of his mortgage against this railroad parcel, unless, by some act of himself or his intestate, the railroad companies have been deceived or misled, so that it would be bad faith on his part to enforce this mortgage as against this strip. There is no evidence in the record of any such act. The fact that the land bid in by him may be estimated by witnesses to be worth the full amount of what he bid, and the amount of his mortgage added thereto, furnishes no reason why he should not collect his mortgage against the other parcel, if it be worth it. The defendant companies had notice of the sale, and were amply able to protect themselves, and there is no reason, but their own failure to do so, that excuses the situation in which they are now placed. Certainly there was no relation between them and the administrator that forced him to bid one cent more or less than he desired to upon either of these parcels, or to lose in any way the same benefit of his purchase that would under the law accrue to any other person. Suppose that some person other than the administrator had made this bid, and the administrator and the solicitor for the railroad companies had stood by, as Mr. O'Brien did in this case, and permitted the land to be struck off to such third person. Would the rights of such third person have been affected thereby, in his purchase, by the fact that the land so bid in was worth the value of both mortgages? Not at all. And would the administrator have lost thereby any of his mortgage lien upon the railroad parcel? We think not. He would have lost his lien upon the first parcel, and the title would have passed to the purchaser, freed from his lien, and from all equities of the defendant railroad companies; and the administrator would then have had his lien upon the railroad parcel to the full extent of his mortgage security, and no

one would have been to blame for it but the railroad companies. As long as the holder of a second mortgage sees land enough left from the sale under the first mortgage, he can, if he chooses, refrain from bidding on such sale, and rely for his security upon the land unsold, or he may bid in enough of the land to discharge the first mortgage, and enforce his security upon what remains, if he is guilty of no deception or fraud in such purchase, especially when the owner of the remaining parcel is upon the ground, and is fully apprised of the situation, and in a condition to protect himself by also bidding upon the parcel or parcels sold. Any other holding would be inequitable and unjust.

The decree of the court below is affirmed, with costs.

The other Justices concurred.